**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CIS COMMUNICATIONS, LLC, | ) | |
| a Missouri limited liability company, | ) | |
| individually and on behalf of all | ) | |
| those similarly situated, | ) | Case No. 4:19-cv-389 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **NATIONWIDE CLASS ACTION** |
| v. | ) | **COMPLAINT FOR BREACH OF** |
| | ) | **CONTRACT** |
| REPUBLIC SERVICES, INC., | ) | |
| a Delaware corporation, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| and | ) | |
| | ) | |
| ALLIED SERVICES, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff CIS Communications, LLC ("Plaintiff" or "CIS"), on behalf of itself and all others similarly situated, for its cause of action against Defendants Republic Services, Inc. ("Republic") and Allied Services, LLC ("Allied") (collectively "Defendants"), states to the Court as follows:

## NATURE OF ACTION

1.      This class action arises from Defendants' breach of their standard form contract with residential and business solid waste collection customers that hired Defendants to dispose of their waste.

2.      Defendants' standard form contract contains a base price which can only be increased upon specific circumstances, and generally operates to allow Defendants to pass through only certain increases in identified costs of providing services to the customer.

1

3.      Plaintiff has been assessed certain price increases which are not authorized by the terms of its service contract.

4.      Defendants are aware that the price increases are not authorized because they have offered to waive the price increases for Plaintiff and other customers if the customers complain.

5.      Upon information and belief, Defendants have imposed the service charge increases in order to increase their operating and profit margins rather than to recoup their increased costs of providing services.

6.      On behalf of itself and all others similarly situated, Plaintiff seeks relief from Defendants for injuries caused by this common practice, including: (a) an order certifying the action to be maintained as a Class action and ordering Plaintiff and its counsel to represent the Class; (b) compensatory damages; (c) punitive damages; (d) attorneys' fees; (e) costs of this suit; (f) pre- and post-judgment interest; and (g) such other and further relief as this Court may deem necessary and proper.

**PARTIES**

7.      Plaintiff is a Missouri limited liability company with its principal place of business in St. Louis County, Missouri.  Plaintiff contracted with Midwest Waste and its successors-in-interest Allied and Republic from May 24, 2005 until 2018 for waste removal services.

8.      Upon information and belief, Midwest Waste, Inc., a Missouri corporation, merged into Defendant Allied, a Delaware limited liability company, on or around March 9, 1998.

9. Upon information and belief, Defendant Allied operates as a subsidiary or affiliate of Defendant Republic, a Delaware corporation.

10. Upon information and belief, Republic's and Allied's principal places of business are both located at 18500 North Allied Way, Phoenix, Arizona 85054.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332(d), as upon information and belief the proposed class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from the Defendants, and seeks in the aggregate more than $5,000,000, exclusive of costs and interest. On information and belief, more than two-thirds of the members of the Classes defined below are residents of states other than Missouri.

12. A substantial part of the events or omissions alleged herein arose within this District, pursuant to 28 U.S.C. § 1391(a), and within this Division.

13. According to Republic's website, Republic and/or its subsidiaries and affiliates continuously and systematically solicit customers and provide services within 40 states and Puerto Rico, including Missouri, and therefore Defendants are subject to personal jurisdiction in the District and Division.

## FACTUAL ALLEGATIONS

14. Republic advertises itself as the second largest provider of services in the domestic, non-hazardous solid waste industry.

15. Republic's website states the following, in part:

> Through our subsidiaries, we provide non-hazardous solid waste and recycling services for commercial, industrial, municipal, and residential customers. Our customers come first as we strive to safely and sustainably provide reliable service through 340 collection operations, 201 transfer

stations, 195 active landfills, 90 recycling centers, 7 treatment, recovery and disposal facilities, 12 salt water disposal wells, and 68 landfill gas and renewable energy projects across 40 states and Puerto Rico. [1]

16.     Republic is a publicly traded company which generated over $10,000,000,000 in revenue in 2017.  According to Republic's Form 10-K annual report filed with the Securities and Exchange Commission for the year ending December 31, 2017 ("10-K"), Republic provides residential, small-container and large-container solid waste collection services in addition to offering other more specialized services.

17.     According to Republic's 10-K, approximately 74% of its total revenue in 2017 was derived from its waste collection business, of which approximately 23% of the total revenue related to residential services, approximately 30% related to small-container services, and approximately 21% related to large container services.

18.     Republic's 10-K states the following in connection with its residential services:

> Our residential collection business involves the curbside collection of waste for transport to transfer stations, or directly to landfills or recycling centers. We typically perform residential solid waste collection services under contracts with municipalities, which we generally secure through competitive bid and which give us exclusive rights to service all or a portion of the homes in the municipalities. These contracts usually range in duration from one to five years, although some of our exclusive franchises are for significantly longer periods. We also perform residential services on a subscription basis, in which individual households contract directly with us. The fees received for subscription residential collection are based primarily on the market, collection frequency, type of service, the distance to the disposal facility and the cost of disposal. In general, subscription residential collection fees are paid quarterly in advance by the customers receiving the service.

19.     Republic's 10-K states the following in connection with its small-container business:

---

[1] Republic Services, About Us, https://www.republicservices.com/about-us (last visited Feb. 13, 2019).

> In our small-container business, we supply our customers with waste containers of varying sizes. We typically perform small-container collection services under one- to three-year service agreements, and fees are determined based on a number of factors including the market, collection frequency, type of equipment furnished, type and volume or weight of the waste collected, transportation costs and the cost of disposal. Our small-container services are typically offered to small business complexes, multi-family housing and strip malls, and include industries such as restaurants, retail, real-estate, and professional and other services.

20.    Republic's 10-K states the following in connection with its large-container collection business:

> Our large-container collection business includes both recurring and temporary customer relationships. For the recurring portion, we supply our customers with waste containers of varying sizes and rent compactors to large waste generators. We typically perform the collection services under one- to three-year service agreements, and fees are determined based on a number of factors including the market, collection frequency, type of equipment furnished, type and volume or weight of the waste collected, transportation costs and the cost of disposal. Our recurring large-container services are typically offered to larger facilities, hotels and office buildings, and include industries such as manufacturing, retail, hospitality, professional and other services.

21.    Defendants enter into service agreements for waste collection with customers nationwide, either directly or through their subsidiaries, using a contract ("Service Agreement"), that establishes, among other terms and conditions, a basic price for the service based on the volume and type of waste collected ("Service Charge").  The Service Agreement dated May 24, 2005 between CIS and Defendants (originally Midwest Waste) is attached hereto and incorporated herein as Exhibit 1.

22.    Upon information and belief, the Service Agreement is a standardized form contract, the same or similar version of which is used to contract with residential customers, small-container customers, and/or large-container customers.

23.     The first page of the Service Agreement identifies the type of container provided to the customer, the frequency of trash pickup, and the basic monthly service charge agreed to by the parties.  The second page of the Service Agreement contains a section identified as the "Terms and Conditions".

24.     The Service Agreement requires Defendants to collect and dispose of the customer's trash as set out by the customer for collection in the container provided by Defendants.

25.     The time period of the Service Agreement is typically an initial term, and then the Service Agreement automatically renews for successive renewal terms of the same or different time periods unless either party provides written notice of termination within a certain time period prior to the beginning of the automatic renewal term.

26.     Republic handles all billing for its subsidiaries and affiliates, issues all invoices to the customers, and upon information and belief determines whether to increase the Service Charges.  All payments by customers are delivered to and deposited by Republic.

**SERVICE CHARGES**

27.     The Service Agreement does not provide for automatic increases in the Service Charges either periodically or upon the automatic renewal of the Service Agreement.

28.     Defendants are only authorized to increase the Service Charges recited in the Service Agreement based on certain conditions contained therein.

29.     These conditions are outlined in Article VI of the Service Agreement, "Rate Adjustments", which states the following:

> Because disposal and fuel costs constitute a significant portion of the cost of Midwest Waste's services provided hereunder Customer agrees that Midwest Waste may increase the rates hereunder proportionately to adjust for any increase in such costs or any increases in transportation costs due to

changes in location of the disposal facility. Customer agrees that Midwest Waste may also increase the rates from time to time to adjust for increase in the Consumer Price Index, and Customer agrees that Midwest Waste may also proportionately pass through to Customer increases in the average weight per container yard of the Customer's Waste Materials, increase in Midwest Waste's costs due to changes in local, state or federal rules, ordinances or regulations applicable to Midwest Waste's operations or the services provided hereunder, and increases in taxes, fees or other governmental charges assessed against or passed through to Midwest Waste (other than income or real property taxes). Midwest Waste may only increase rates for reasons other than those set forth above with the consent of the Customer. Such consent may be evidenced verbally, in writing or by the actions and practices of the parties.

30.     According to the above-cited language of Article VI of the Service Agreement, Defendants were allowed to increase the Service Charges billed to Plaintiff without further authorization from Plaintiff if the increases were computed based on the following items:

(a)  proportionately based on increases in the following components of Defendants' costs:

(1) disposal and fuel costs;

(2) transportation costs due to changes in the location of the disposal facility;

(3) increases in the average weight per container yard of the Customer's Waste Materials;

(4) increases in Defendants' costs due to changes in local, state or federal rules, ordinances or regulations applicable to Defendants' operations or the services provided;

(5)  increases in taxes, fees or other governmental charges assessed against or passed through to Defendants (other than income or real property taxes); or

(b) increases in the Consumer Price Index

31.     These potential future increases in the Service Charges which were pre-authorized by Plaintiffs are referred to herein as the "Authorized Service Charge Increases".

32.     The Authorized Service Charge Increases constitute reimbursement for increases in Defendants' costs of providing service to the customer, or are tied to increases in the Consumer Price Index.

33.     If Defendants desired to increase the Service Charges for reasons other than those specifically identified in Article VI of the Service Agreement, then Defendants were required to obtain the consent of Plaintiff.  The potential future increases in the Service Charges which required the consent of Plaintiff are referred to herein as the "Optional Service Charge Increases".

34.     Article VI does not authorize Defendants to increase the Service Charges to increase Defendants' operating or profit margins, or to reimburse Defendants' costs not identified as an Authorized Service Charge Increase, without the consent of the customer.  Any such increases would be categorized as Optional Service Charge Increases.

35.     The Service Agreement does not allow Defendants to terminate the Service Agreement or stop providing services if the customer does not consent to an Optional Service Charge Increase.

36.     The customer is invoiced for the Service Charges pursuant to Article V of the Service Agreement, "Payment", which states in part "Customer agrees to pay Midwest Waste on a monthly basis for the services and/or equipment furnished by Midwest Waste in accordance with the charges and rates provided for herein".

37.     Article V of the Service Agreement allows Defendants to impose a late fee for past due payments.

38.     The customer is not allowed to terminate the Service Agreement at will.  In the event the customer attempts to terminate the Service Agreement other than by waiting for the expiration of the current term and providing written notice of termination prior to same, the customer is subject to liquidated damages pursuant to Article X of the Service Agreement.

**INVOICES**

39.     As stated above, Republic handles all billing for its customers, and all payments by customers are made to Republic and processed through Republic.

40.     Republic bills its customers for its services on a monthly basis.

41.     The Service Agreement provides the following requirements for payment:

> **ARTICLE V**
> **PAYMENT**
>
> Customer agrees to pay Midwest Waste on a monthly basis for the services and/or equipment furnished by Midwest Waste in accordance with the charges and rates provided for herein. Payment shall be made by Customer to Midwest Waste within ten (10) days of an invoice from Midwest Waste. Midwest Waste may impose and customer agree to pay a late fee for all past due payment, such late fee as determined by Midwest Waste in an amount not to exceed the maximum rate for same allowed by applicable law.

42.     Upon information and belief, Republic utilizes a standard form invoice to bill all of its customers. A true and correct example of Republic's standard form invoice delivered to CIS is attached hereto and incorporated herein as Exhibit 2 (the "Invoice").

43.     The Invoice identifies the "Total Amount Due", and the "Payment Due Date".

44.     The Invoice breaks down the Total Amount Due into three categories – a "Pickup Service" charge, an "Administrative Fee", and a "Total Fuel/Environmental Recovery Fee", which collectively constitute the Service Charges.

45.     The Current Invoice Charges amount matches the Total Amount Due unless there are past due charges from a previous month included in the Total Amount Due.

46.     The Service Charges are increased by Republic on a regular basis.

47.     The increases in the Service Charges are always presented on the Invoice as Authorized Service Charge Increases.

48.     The Invoice never states that any increases from month to month in the Service Charges are Optional Service Charge Increases.

49.     The Invoice always states a Total Amount Due in the form of a lump sum, and has never contained a breakdown stating that some of the increases in the Service Charges are Authorized Service Charge Increases while others are Optional Service Charge Increases which require the customer's consent.

50.     The Invoice never asks for the customer's consent to any increases in the Service Charges which occur from month to month either before or after invoicing the customer for the Total Amount Due.

51.     The Invoice never states that the customer has the right to not pay some or all of the increase in the Service Charges specified in the Invoice.

52.     The Invoice never states that the customer will still receive trash service if some of the increase in the Service Charges is not paid because some or all of the increase in Service Charges is optional and requires the customer's consent.

53.     The Invoice indicates that Republic is not waiting on the customer's consent.  For example, Plaintiff is invoiced on June 20, 2018 for trash services July 1-31, 2018, but payment is not due until July 10, 2018.  Defendants have already performed services for ten days before payment from Plaintiff is due, which indicates that Defendants are not waiting for consent from the customer to the stated Service Charge.  See Exhibit 2.

54.     There is no information contained in the Invoice indicating that Defendants are increasing their Service Charges due to any reason other than an Authorized Service Charge Increase.

55.    There is nothing shown on the Invoice indicating that Defendants will not exercise their remedies for nonpayment if the Total Amount Due is not paid in its entirety by the customer because some of the amount due is optional.  Such remedies would include charging the customer Late Fees as authorized by the Service Agreement (Article V), terminating the Service Agreement for nonpayment (Article XI), or charging the customer Liquidated Damages (Article X).

56.    Due to the foregoing, the Invoice constitutes a clear representation by Republic that all of the Service Charges described in the Invoice are mandatory under the Service Agreement, and any increases thereto consist solely of Authorized Service Charge Increases which do not require the customer's consent.

57.    Plaintiff has never given its consent to any Optional Service Charge Increase, nor has Plaintiff ever been asked by Defendants to give its consent to an Optional Service Charge Increase.

58.    Plaintiff believed that the increases in the Service Charges were always Authorized Service Charge Increases when it paid its monthly invoices.

59.    Plaintiff was reasonable in its belief that the increases in the Service Charges were Authorized Service Charge Increases because the Service Agreement states that Defendants needed Plaintiff's consent to any Optional Service Charge Increases, and Defendants never requested nor did Plaintiff ever grant such consent for any of the increases in the Service Charges.

60.    Additionally, due to the fact that Defendants were not allowed to terminate services under the Service Agreement due to any withholding of consent by Plaintiff to an

11

Optional Service Charge Increase, it does not make sense that Plaintiff would actually pay such an Optional Service Charge Increase because such payment would be completely voluntary.

61.     Upon information and belief, Defendants have increased Plaintiff's Service Charges without following the contractual requirements of Article VI of the Service Agreement related to the Authorized Service Charge Increases.

62.     Upon information and belief, Defendants did not internally correlate any increases in the Service Charges to their own costs, or any of the authorized reasons for increases discussed under Article VI of the Service Agreement.

63.     Upon information and belief, Defendants' costs did not increase by the same percentages as Defendants increased Plaintiff's Service Charges.

64.     Defendants' costs fluctuated from year to year, but Defendants did not modify the amount of the Service Charge increases to reflect these fluctuations.

65.     To illustrate the basis for Plaintiff's belief, Plaintiff's monthly Service Charge increased from $44 per month starting in June, 2005 to $328.19 in 2018 for the same service.

66.     According to Article VI of the Service Agreement, the increase in Plaintiff's Service Charge from $44 per month in 2005 to $328.19 in 2018 should have been based on increases in Defendants' costs or the Consumer Price Index, and Plaintiff never consented to any increases which were outside of the pre-authorized categories specified in Article VI.

67.     From 2015 to 2016, Defendants increased Plaintiff's Service Charges by 15.6%. From 2016 to 2017, Plaintiff experienced a 29.9% increase in Service Charges over the prior year.  From 2017 to 2018, Defendants increased Plaintiff's Service Charges by 17.9%.

68.     Plaintiff believed these increases were Authorized Service Charge Increases which reflected a pass-thru of Defendants' increased costs of providing service to Plaintiff.

12

69.     In 2018, after Plaintiff was assessed an 18.7% increase in Service Charges through July of 2018, Plaintiff contacted Defendants to complain about the continuing increase in its Service Charges.

70.     In response, Defendants offered to reduce Plaintiff's Service Charge from $328.19 to an average monthly Service Charge of $55.00.

71.     Due to the offer to decrease Plaintiff's Service Charge in such a drastic manner, Plaintiff believes that the entire reduction of $273.19 ($328.19-$55 = $273.19) constitutes a reduction solely in Defendants' operating or profit margin.

72.     It is unlikely that Defendants were offering to provide services to Plaintiff below cost by offering a price level of $55.00.  The more likely explanation is that Defendants have increased their Service Charges in a manner not authorized under Article VI of the Service Agreement, resulting in a larger profit margin for Defendants than is authorized under Article VI. Such activity would enable Defendants to reduce their Service Charges to Plaintiff from $328.19 to $55 and still cover their costs of providing the service.

73.     Based on the foregoing, Plaintiff terminated its Service Agreement with Defendants in 2018.

74.     The Authorized Service Charge Increases do not include authorization for Defendants to increase the Service Charges to increase their operating or profit margins. Without the customer's consent, Defendants were limited by the Service Agreement to increases related solely to increases in their costs or the Consumer Price Index as identified in the categories specifically described in Article VI.

75.     If Defendants were following the rate increase requirements under Article VI, it is likely Defendants would not have the ability to reduce Plaintiff's Service Charges by over 83%

($273.19/$328.19=83.24%) and still make a profit or be willing to provide services to Plaintiff for the reduced charge.

76.     Due to this factual scenario, Plaintiff believes that Defendants are overcharging their customers by significant amounts and therefore breaching the terms of the Service Agreements.

77.     Defendants had valid options available to effectuate an increase in their operating or profit margins.  For example, Defendants could have terminated the existing Service Agreement each year and asked its customers to sign new Service Agreements which contained revised Service Charges.  Instead, Defendants chose to renew the existing Service Agreements each year and simply increase the Service Charges without contractual authorization.

78.     The method by which Defendants increased the Service Charges misrepresented to Plaintiff and other customers that the increases fell under one or more of the Authorized Service Charge Increases which the customers did not have the right to refuse.

79.     Plaintiff would not have made any such payments if it had known the facts, i.e. that a portion of the charges were optional and not mandatory, or that Plaintiff would still be entitled to receive trash service if Plaintiff had not paid the entire amount shown on the Invoice.

80.     In the event that Plaintiff has paid any Optional Service Charge Increases without consenting to them, Plaintiff is entitled to a refund of those amounts.

81.     Upon information and belief, Defendants calculate their rate increases on a class-wide basis and not individually for each customer.

82.     Defendants should be in possession of readily accessible accounting records detailing whether the calculations for the increase in the Service Charges fall within or without

the categories of the Authorized Service Charge Increases in Article VI of the Service Agreement.

83.    Defendants would also necessarily have to keep individualized records of customers who allegedly consented to an Optional Service Charge Increase, and the details of the manner of their consent.

84.    Any increases in the Service Charges which were identified by Defendants at the time of the rate increase as belonging to one of the following categories, and actually belongs to one of the following categories, would possibly be authorized under Article VI of the Service Agreement:

(a)  proportionately based on increases in the following components of Defendants' costs:

(1) disposal and fuel costs;

(2) transportation costs due to changes in the location of the disposal facility;

(3) increases in the average weight per container yard of the Customer's Waste Materials;

(4) increases in Defendants' costs due to changes in local, state or federal rules, ordinances or regulations applicable to Defendants' operations or the services provided;

(5)  increases in taxes, fees or other governmental charges assessed against or passed through to Defendants (other than income or real property taxes); or

(b) increases in the Consumer Price Index

85.    Any increases in the Service Charges outside of these categories (e.g. to increase Defendants' operating or profit margins, or to reimburse Defendants for a cost not described in Article VI of the Service Agreement) constitute a breach of the Service Agreement and should be refunded to customers who did not provide consent to the rate increase.

**CLASS ACTION ALLEGATIONS**

86.    Plaintiff brings this action pursuant to Rule 23(b)(1), (2) and (3) of the Federal

Rules of Civil Procedure, on behalf of themselves and the members of the following Class:

> All persons and entities in the United States that, pursuant to a Service Agreement
> or substantially similar contract with Republic or a subsidiary or affiliate, paid a
> flat fee for waste disposal services and whose fee was increased by Defendants for
> reasons not authorized by the contract.

87.    Excluded from the Class are Defendants, any entity in which Defendants have a

controlling interest or which has a controlling interest in Defendants, and Defendants' legal

representatives, predecessors, successors, assigns, and employees.

88.    The definition of the Class is unambiguous.  Plaintiff is a member of the Class it

seeks to represent.  Members of the Class can be identified using Defendants' records of

contracts and other information that is kept by Defendants in the usual course of business and/or

in the control of Defendants.  Records kept by Defendants identify the Class members who

entered into a Service Agreement or other contract with Defendants or their predecessors,

subsidiaries or affiliates and are billed by Defendants.  The members of the Class can be notified

of the Class action through publication and direct mailings to address lists maintained in the

usual course of business by Defendants.

89.    Pursuant to Rule 23(a)(1), Class members are so numerous that their individual

joinder is impracticable.  Republic provides services to millions of customers, and a large

number of these customers are Class members.  The precise number of Class members is

unknown to Plaintiff, but that number greatly exceeds the number to make joinder impossible.

90.    Pursuant to Rule 23(a)(2) and (b)(3), except as to the amount of damages each

member of the Class has by himself/herself/itself sustained, questions of fact and law are

common to the Class, and common questions of law and fact predominate over the questions

affecting only individual Class members.  Some of the common legal and factual questions include:

(a)        Whether Defendants used standard form contracts with their customers that charged a flat fee for solid waste disposal;

(b)        Whether Defendants imposed price increases on their customers that varied from the flat fee in the original form contract;

(c)        Whether Defendants' standard form contracts provided that Defendants could only adjust the Service Charges for the following, or similarly limited reasons:

(1)  proportionately based on increases in the following components of Defendants' costs:

(a) disposal and fuel costs;

(b) transportation costs due to changes in the location of the disposal facility;

(c) increases in the average weight per container yard of the Customer's Waste Materials;

(d) increases in Defendants' costs due to changes in local, state or federal rules, ordinances or regulations applicable to Defendants' operations or the services provided;

(e)  increases in taxes, fees or other governmental charges assessed against or passed through to Defendants (other than income or real property taxes); or

(2) increases in the Consumer Price Index;

(d)        Whether Defendants' price increases imposed on their customers were authorized by the rate increase provisions in the standard form contract;

(e)        Whether Defendants breached their contracts with Plaintiff and Class members;

(f)        The nature and extent of damages and other remedies to which the conduct of Defendants entitles Plaintiff and the Class members.

91.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Class members.  A single, common policy to impose price increases not authorized by the Service Agreements or calculated based on costs incurred by Defendants is at issue in this case.  Individual questions, if any, pale by comparison to the numerous common questions that dominate.  Upon information and belief, Defendants calculated their price increases on a class-wide basis.

92.     The injuries sustained by the Class members flow, in each instance, from a common nucleus of operative facts caused by Defendants' misconduct.  Each Class member was invoiced for a price increase that was not calculated using dollar amounts of the costs Defendants incurred and was not authorized by the Class member's contract.

93.     Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff, like other members of the Class, paid price increases that were not calculated using dollar amounts of the costs Defendants incurred, and were not authorized by its contract with Defendants.  Plaintiff was subject to, and was financially harmed by, a common policy and practice applied by Defendants to all Class members to charge unauthorized price increases.

94.     Pursuant to Rule 23(a)(4) and (g)(1), Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff is familiar with the basis facts that form the bases of the Class members' claims.  Plaintiff's interests do not conflict with the interests of the other Class members that it seeks to represent.  Plaintiff has retained counsel competent and experienced in class action litigation and intends to prosecute this action vigorously.  Plaintiff's counsel has successfully prosecuted complex class actions.  Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the Class members.

18

95.     Pursuant to Rule 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, Plaintiffs and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

96.     Individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court. Given the similar nature of the claims of the members the Class, the Class's claims will be effectively managed by the Court and the parties.

97.     Although there is no choice of law provision contained in the Service Agreement, the issues are pure contract law – whether Defendants have breached the terms of their standard form contract by raising the prices for their customers without contractual authorization.  The relevant state law should be identical due to the simplicity of the issue.

## COUNT I - BREACH OF CONTRACT

98.     Plaintiff realleges and incorporates by reference the preceding allegations as if fully set forth herein.

99.     Defendants formed agreements and entered into valid and enforceable contracts with Plaintiff and members of the Class including offer, acceptance, and consideration.

100.    Defendants provided Plaintiff and members of the Class with a written standard form agreement drafted by Defendants, and Plaintiff and members of the Class accepted Defendants' offer and exchanged consideration by using Defendants' services and paying for them.

101.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under their contracts with Defendants.

102.    Plaintiff and members of the Class paid a Service Charge (usually monthly) as expressly set out in their agreements with Defendants as compensation for the services Defendants provided.

103.    Plaintiff and members of the Class fulfilled their contractual obligations to Defendants.

104.    Defendants breached their agreements with Plaintiff and members of the Class by imposing price increases that bore no relation to costs Defendant incurred. Such increases were not provided for in the contracts or agreed to by Plaintiff and members of the Class.

105.    As a direct and proximate result of Defendants' breaches of their agreements, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff and the Class members request this Court grant judgment for compensatory and punitive damages in an amount to be determined at trial, as well as all relief sought in the Request for Relief set forth at the end of this Complaint and any other relief this Court deems just and proper.

## COUNT II - DECLARATORY JUDGMENT

106.    Plaintiff realleges and incorporates by reference the preceding allegations as if fully set forth herein.

107.    An actual and genuine justifiable controversy exists, between Defendants on the one hand and Plaintiff and Class on the other, concerning the validity of the Service Agreement, the rights of Plaintiff and Class, and the legality of Defendants' conduct as described in this Complaint, which has resulted, or imminently will result, in depriving Plaintiff and Class of their property, their rights and liberties.

108.    Pursuant to 28 U.S.C. § 2201 *et seq* and Fed. R. Civ. P. 57, Plaintiff requests declaratory judgment concerning the following:

    a.  Whether the price increases were invalid, void, and/or unenforceable as a matter of law because they were not authorized in the Service Agreement;

    b.  Whether Defendants may continue to attempt to collect payment from Plaintiff and the Class of the unauthorized charges; and

    c.  Whether Defendants must refund to Plaintiff and the Class the unauthorized fees and disgorge all money Defendants unlawfully obtained from Plaintiff and the Class.

109.    Despite Defendants' knowledge of this controversy, Plaintiff and Class have received no refunds of the unauthorized charges paid, and Plaintiff and Class are aware of no change in the Service Agreement or Defendants' conduct.

110.    As such, an actual and genuine controversy exists between the Parties, and this Court is vested with the power to declare the rights and liabilities of the Parties with regard to the Service Agreement and/or the relevant laws.

WHEREFORE, Plaintiff and the Class members request this Court enter a Declaratory Judgment declaring the price increases invalid, void, and/or unenforceable under the Service Agreements, and further order that all such unauthorized charges be removed from the accounts of Plaintiff and the Class members, and that Defendants disgorge all monies unjustly collected,

as well as all relief sought in the Request for Relief set forth at the end of this Complaint and any other relief this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class members request that the Court enter an order or judgment against Defendants including the following:

A.    Declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiff as Class representative;

B.    Declaring that Defendants' practice of charging Plaintiff and the Class with price increases breached Defendants' contracts with Plaintiff and the Class and was wrongful and unfair;

C.    Declaring that, because of Defendants' breach of contract, Defendants' agreements with Plaintiff and the Class are void and unenforceable;

D.    Restitution of all unauthorized price increases paid to Defendants by Plaintiff and the Class, in an amount to be determined at trial;

E.    Actual damages in an amount according to proof;

F.    Punitive damages;

G.    Compensatory damages caused by Defendants' unfair or deceptive practices; along with exemplary damages to Plaintiff and each Class member for each violation;

H.    A permanent injunction requiring Defendant to cease charging unauthorized price increases or to modify its standard form contracts and invoices to inform all customers that it imposes Optional Service Charges Increases not connected to Authorized Service Charge Increases;

I.      Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

J.      An order awarding Plaintiff and the Class their attorney's fees and costs and expenses incurred in connection with this action; and

K.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: March 1, 2019                    Respectfully submitted,

                                        KEANE LAW LLC

                                        /s/ Nathaniel R. Carroll
                                        Ryan A. Keane, #62112
                                        Nathaniel R. Carroll, #67988
                                        7777 Bonhomme Ave, #1600
                                        St. Louis, MO 63105
                                        Phone: (314) 391-4700
                                        Fax: (314) 244-3778
                                        ryan@keanelawllc.com
                                        nathaniel@keanelawllc.com
                                        *Attorneys for Plaintiff*

                                        and

                                        /s/ Michael C. Seamands
                                        Michael C. Seamands, #45989
                                        Law Offices of Michael C. Seamands, LLC
                                        1401 S. Brentwood Blvd, Suite 825
                                        St. Louis, MO 63144
                                        Tel:  314.802.7730
                                        Fax:  314.260.9645
                                        mcs@mcs-legal.com
                                        *Attorney for Plaintiff*